UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAFAEL FONTANEZ,                    )
                 Petitioner        )
                                    )
          v.                        )     CA 04-30007-MAP
                                    )
                                    )
UNITED STATES OF AMERICA,           )
                 Respondent.        )
_____)

## GOVERNMENT'S RESPONSE TO RAFAEL FONTANEZ'S § 2255 MOTION TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE

The United States of America, by its undersigned attorneys, submits this memorandum in response to Rafael Fontanez's § 2255 Motion and Memorandum.

I.    Background

On October 15, 1998, the defendant was indicted by a grand jury in an eight-count indictment along with two co-defendants. Count One charged that the defendants conspired to distribute cocaine base between June 29, 1998 and October 6, 1998 in violation of 21 U.S.C. § 846. The defendant was charged in Counts Six through Eight with distributing cocaine base on August 20, September 8, and October 6, 1998, respectively, in violation of 21 U.S.C. § 841(a)(1). On January 20, 2000, after an eight-day jury trial, Fontanez was convicted on all counts. On January 30, 2001 he was sentenced to 216 months in prison on all counts.

The defendant now seeks to have his sentence vacated, his conviction reversed and to be released from custody. He now

1

alleges that his trial attorney, Joseph Bernard, was ineffective. Fontanez relies on several reasons, including the fact that "counsel did not conduct an investigation into the prosecution's theory of conspiracy, despite the existence of material witnesses and documentary evidence to rebut the indictment and all its claims." Memorandum at 2. Fontanez continues alleging "counsel did not explore the evidence or witnesses to determine veracity of utility, nor assess their actual benefit or harm before alienating petitioner's defense." Id. Fontanez further states that "failure to interview readily available witnesses constitutes ineffective assistance of counsel...", and that "these witnesses have direct knowledge that an indicted codefendant admitted the innocence and exoneration of this petitioner." Id. at 2-3.

Further, Fontanez alleges that trial counsel did not make sufficient use of various documents including a business permit from the Fontanez's hair cutting business, Shear Perfectionz, as well as various daily planners. Id. at 5.

Fontanez also seeks to reargue the suppression of a confession he made which was admitted at trial. Id. at 8.

Fontanez filed several affidavits. One alleged to be from co-defendant Anthony Bledsoe, who states that Fontanez was not involved in drug dealing with Bledsoe. There are also affidavits from Christy Torres, Edwin Santana, and Larry Finney.

2

The government responds below to each of these issues.  For the reasons set forth herein, the Court should deny the defendant's motion.

II.  Facts

The evidence introduced at trial included the testimony of an undercover agent ("UCA") and the consensually recorded telephone conversations and meetings the UCA had with co-defendant Anthony Bledsoe for the purpose of purchasing crack cocaine.  Most of the actual drug transactions were also videotaped.  Although Fontanez was not recorded during any of these conversations or meetings, there was testimony by surveillance agents that Fontanez drove Bledsoe to three of the deals and picked up the crack cocaine before the last deal.  The evidence also included a post-Miranda confession by Fontanez.

1.  The drug transactions.

Beginning in July of 1998, Drug Enforcement Administration ("DEA") Special Agent ("SA") Gregg Finning, acting as a UCA, participated in an investigation of crack cocaine distributors in Springfield, Massachusetts.  [Tr. 1/10/00 at 93].  On July 1, 1998, a cooperating witness introduced the UCA to Robert Phillips ("Phillips"), a/k/a Bam.  [Tr. 1/10/00 at 96; Tr. 1/11/00 at 119].  Phillips sold the UCA one-half ounce of crack cocaine for $400.  [Tr. 1/10/00 at 97-98].  Phillips' source of supply was co-defendant Anthony Bledsoe ("Bledsoe"), a/k/a Ice.  [Id.]

The UCA arranged a second purchase of crack cocaine from Phillips on July 8, 1998, this time for one ounce. [Tr. 1/11/00 at 113]. After the deal, the UCA called Phillips to complain that the crack cocaine actually delivered was six grams short of the agreed upon ounce. [Tr. 1/11/00 at 120]. Bledsoe, who answered the telephone, told the UCA that he would make up the difference in the next deal and that in the future the UCA should deal directly with Bledsoe. [Tr. 1/11/00 at 121].

The UCA called Bledsoe on July 16, 1998 to arrange the purchase of two ounces of crack cocaine for $1500. [Tr. 1/11/00 at 122]. They met on Stebbins Street in Springfield, where Bledsoe told the UCA that he only had one ounce of crack cocaine because he had just sold one-half kilogram of crack. [Tr. 1/11/00 at 123]. The UCA gave Bledsoe $800 in exchange for one ounce of crack and Bledsoe agreed to future drug deals involving larger quantities of crack. [Tr. 1/11/00 at 124].

The UCA next contacted Bledsoe on August 5, 1998, purportedly to meet with him to discuss another purchase of crack cocaine. [Tr. 1/11/00 at 125-126]. The DEA, however, had arranged to have a state trooper in a marked cruiser effect a motor vehicle stop of the UCA's car in order to obtain a picture identification of Bledsoe to ascertain his true identity. [Id.] After the motor vehicle stop, in Springfield, MA, Bledsoe gave the UCA a free sample of crack which he said was high quality.

4

[Tr. 1/11/00 at 129, 132; Gvt.Ex. 22].  The UCA told Bledsoe that
he wanted to buy four ounces (112 grams) of crack for $3,300.
Bledsoe told the UCA to order a "big-eight," or one-eighth of a
kilogram (125 grams), of crack, and the two men agreed on a price
of $3,300.  [Tr. 1/11/00 at 132-33].

On August 7, 1998, the UCA called Bledsoe and they agreed
that in exchange for $3,200, Bledsoe would supply the UCA with
the "big-eight" plus the six grams the UCA was short from the
previous deal, for a total of 131 grams.  [Tr. 1/11/00 at 135].
Later that day, the UCA and Bledsoe conducted their drug deal in
the UCA's car in the parking lot of the Colonial Estates
apartment complex in Springfield.  [Tr. 1/11/00 at 139-40;
Gvt.Ex.23].  Bledsoe told the UCA that he only had 125 grams, and
the men agreed on a price of $3,100.  [Tr. 1/11/00 at 142;
Gvt.Ex. 29].  The UCA also asked Bledsoe if he could supply one-
half kilogram of crack the next time; Bledsoe said he could.
[Tr. 1/11/00 at 140; Gvt.Ex. 29].

On August 20, 1998, the UCA again called Bledsoe and
arranged to purchase six ounces of crack for $4,000.  [Tr.
1/11/00 at 143].  Again, the deal occurred inside the UCA's car
in the Colonial Estates parking lot.  [Tr. 1/11/00 at 157, 161;
Gvt.Ex. 31].  The UCA and surveillance agents saw Bledsoe arrive
at the meeting as a passenger in a red Buick with Massachusetts
registration 4691BC.  [Tr. 1/11/00 at 159].  The UCA could not

5

see the driver, but the red Buick had been rented from Enterprise Car Rental by Fontanez. [Tr. 1/11/00 at 160, 162; Tr. 1/12/00 at 338-40; Tr. 1/13/00 at 588-94; Gvt.Ex. 51]. During a telephone conversation with the UCA on August 25, 1998, Bledsoe said that the driver of the red Buick was his Cuban source of supply. [Tr. 1/11/00 at 164; Gvt.Ex. 32].

On September 8, 1998, the UCA called Bledsoe to arrange the purchase of another "big-eight" of crack cocaine. [Tr. 1/11/00 at 166, 168]. The UCA later called Bledsoe again to increase his order to two "big-eights," but also told Bledsoe that he did not have all the money. [Tr. 1/11/00 at 170]. Bledsoe said he would have to check with his partner to see if he could "front" some of the drugs to the UCA. [Id.] Bledsoe called the UCA back and said that his Cuban source of supply would not provide the drugs unless payment was made in full at the time of delivery, but that he would sell the first "big-eight" for $2,900 and the second "big-eight" later in the week for $2,750. [Tr. 1/11/00 at 171].

At approximately 3:05 p.m. on September 8, 1998, the UCA and Bledsoe met at the Colonial Estates apartment complex to exchange a "big-eight" of crack cocaine for $2,900. [Tr. 1/11/00 at 175, 179; Tr. 1/12/00 at 355]. Bledsoe again arrived as a passenger in the same red Buick bearing Massachusetts registration 4691BC, and although the UCA could not identify the driver, it appeared to the UCA to be the same person who drove Bledsoe to the

6

previous deal on August 20, 1998.  [Tr. 1/11/00 at 175-76].
Bledsoe told the UCA that the driver of the car was his source of
supply.  [Tr. 1/11/00 at 176; Gvt.Ex. 34].  During the ensuing
drug transaction, Bledsoe also told the UCA that Bledsoe had to
give the proceeds of the deal to his Cuban source of supply.
[Tr. 1/11/00 at 179; Gvt.Ex. 34].

A surveillance agent identified Fontanez as the driver of
the red Buick.  [Tr. 1/12/00 at 359].  In addition, at the
request of the DEA, on September 8, 1998, the Springfield Police
Department effected a motor vehicle stop of the red Buick bearing
Massachusetts registration 4691BC at approximately 4:25 p.m. and
identified the driver and only occupant as Rafael Fontanez.  [Tr.
1/12/00 at 343, 349].

On September 28, 1998, the UCA received a page to call
telephone number 788-9889, which was subscribed to Fontanez's
barber shop, "Shear Perfection."  [Tr. 1/11/00 at 181].  The UCA
returned the page and spoke to Bledsoe about increasing the
quantity of crack cocaine in the next deal to a quarter kilogram,
or 250 grams, and asked if Bledsoe's Cuban source of supply could
fill the order.  [Tr. 1/11/00 at 182-83;  Gvt.Ex. 60].  The UCA
spoke to Bledsoe again on October 1, 2, and 5, 1998, and asked if
he could buy a kilogram of crack in exchange for $19,000.  [Tr.
1/11/00 at 186-90;  Gvt.Exs. 35, 36, 37].  They agreed to do the
deal on October 6, 1998.  [Tr. 1/11/00 at 190; Gvt.Ex. 37].

7

Bledsoe and the UCA spoke several times on October 6, 1998, to discuss the details of the deal. [Tr. 1/11/00 at 192]. The UCA called Bledsoe at Fontanez's barber shop several times. [Tr. 1/11/00 at 193]. The UCA also received a page to call a number subscribed to a cellular telephone owned by Fontanez, returned the page, and spoke to Bledsoe. [Tr. 1/11/00 at 196-97; Tr. 1/14/00 at 724; Gvt.Ex. 59]. At approximately 2:00 p.m., a surveillance agent observed the rented red Buick parked in front of co-defendant Carlos Quinones' home at 33 Murray Hill Avenue, Springfield. [Tr. 1/13/00 at 430]. At 3:00 p.m., the agent observed Quinones arrive at 33 Murray Hill Road and enter the house. [Id.] Several minutes later, Fontanez quickly exited 33 Murray Hill Avenue with a black backpack, got into the red Buick, and left the area at a high rate of speed. [Tr. 1/13/00 at 430-31].

On October 6, 1998, at approximately 3:35 p.m., a surveil-lance agent observed the rented red Buick bearing Massachusetts registration 4691BC leave the Colonial Estates parking lot and go to a nearby Burger King. [Tr. 1/12/00 at 326-28]. Although the parking lot was almost empty, Fontanez, the driver of the red Buick, parked away from the entrance and backed into the parking spot. [Tr. 1/12/00 at 328, 366]. Fontanez remained in the car while Bledsoe, the only passenger, got out of the car, went into the restaurant for a short period of time, came out carrying a

8

Burger King bag, and got back into the passenger side of the red
Buick.  [Tr. 1/12/00 at 329-30].  The red Buick then returned to
the Colonial Estates parking lot.  [Tr. 1/12/00 at 330].

    The UCA arrived at Colonial Estates at approximately 4:10
p.m. and paged Bledsoe when he did not see him there.  The UCA
received a page to call Fontanez's cellular telephone; when he
returned the page, he spoke to Bledsoe, who was waiting for the
UCA in the red Buick with Fontanez.  [Tr. 1/11/00 at 198-99; Tr.
1/12/00 at 368].  Fontanez had moved the red Buick so that he had
a direct line of sight to the UCA's car.  [Tr. 1/11/00 at 199;
Tr. 1/12/00 at 369].  Bledsoe exited the passenger side of the
Buick carrying the Burger King bag, got into the passenger side
of the UCA's car, and gave the UCA the Burger King bag that
contained one kilogram of crack cocaine.  [Tr. 1/11/00 at 199,
202; Tr. 1/12/00 at 370; Gvt.Ex. 39].  The UCA then gave the
arrest signal and Bledsoe was arrested by other DEA agents.  [Tr.
1/11/00 at 199-200].  Fontanez, who was waiting in the driver's
seat of the red Buick, was also arrested.[1]  [Tr. 1/11/00 at 203;
Tr. 1/12/00 at 371-72].

    2.    Fontanez's post-arrest confession.

---

    [1]At trial, the parties stipulated that the DEA laboratory's
analysis of the crack cocaine sold to the UCA determined the
following: 1) August 5, 1998 sale, 0.73 grams of cocaine base; 2)
August 7, 1998 sale, 121.1 grams of cocaine base; 3) August 20,
1998 sale, 187.4 grams of cocaine base; 4) September 8, 1998
sale, 121.2 grams of cocaine base; and 5) October 6, 1998 sale,
991.7 grams of cocaine base.  [Tr. 1/13/00 at 460].

In the DEA office after his arrest, Fontanez made a post-Miranda confession. The agents had first read Fontanez his Miranda warnings in English in the Colonial Estates parking lot immediately after he was arrested; Fontanez stated at that time that he understood those rights. [Tr. 1/12/00 at 373; Tr. 1/14/00 at 695]. Fontanez was again read the Miranda warnings after he arrived at the DEA office. [Tr. 1/10/00 at 68-70]. This second time, the Miranda warnings were given in both English and Spanish from a DEA form 13 by Task Force Agent ("TFA") Johnny Jusino in the presence of TFA Richard Soto. [Id.] Fontanez said he understood his rights and wanted to waive them and talk to the investigators. [Tr. 1/10/00 at 72]. TFA Soto then asked Fontanez questions. DEA SA David Aldridge and TFA Alex Baginski were present during parts of the interview also, but TFA Soto was the only person present throughout the entire interview of Fontanez. [Tr. 1/10/00 at 73; Tr. 1/14/00 at 743-45].

At trial, TFA Soto and DEA SA David Aldridge testified that Fontanez said that on October 6, 1998, he went to Carlos Quinones' house on the first floor of 33 Murray Hill Avenue, Springfield, where he picked up a black leather bag that contained a kilogram of crack cocaine which he took to the Colonial Estates parking lot. [Tr. 1/10/00 at 76-77, 79; Tr. 1/18/00 at 1018-19]. Fontanez told the agents that he had been selling crack cocaine for one year and that the source of supply

10

was a Colombian from Connecticut.  [Tr. 1/10/00 at 79-81].
Fontanez said he was willing to call his source of supply and
arrange for a delivery of crack cocaine to 33 Murray Hill Avenue,
but that he wanted to speak to his attorney first.  The agents
then ended the interview.  [Tr. 1/10/00 at 82].

   3.   Fontanez's testimony at trial.

   At trial, Fontanez testified that he was not given Miranda
warnings, that he did not confess to the agents, and that he was
not involved in selling the crack cocaine.  [Tr. 1/18/00 at 946-
55].  Fontanez testified, however, that he was the only person
who drove the rented red Buick with Massachusetts registration
4691BC and that he drove Bledsoe to the Colonial Estates parking
lot on August 20, September 8, and October 6, 1998.  [Tr. 1/18/00
at 973-74].

III. Fontanez's § 2255 Claims Have Either Been Previously
     Decided or Waived.

   Fontanez challenged both the sufficiency of the evidence of
his participation in the drug offenses as well as the denial of
his motion to suppress his post-Miranda statements.  The First
Circuit affirmed his conviction.  United States v. Fontanez, 291
F.3d 87, 88 (1st Cir. 2002).  When a claim is decided on direct
appeal it cannot be relitigated under § 2255 except in unusual
circumstances.  Withrow v. Williams, 507 U.S. 680, 720-21
(1993)(Scalia, J., concurring); Argencourt v. United States, 78
F.3d 14, 16 n.1 (1st Cir. 1996).  The only substantial exception

11

is an intervening change in the governing substantive law.  Davis
v. United States, 417 U.S. 333 (1974).  Therefore, the defendant
is precluded from relitigating these issues.

To the extent that the defendant's current issues are
determined by this Court to be different than those already
litigated, Fontanez has defaulted on these issues and can not now
raise them.  A defaulted claim generally cannot be heard on
collateral review unless the applicant shows "cause" for each
failure to raise the claim and "actual prejudice" resulting from
the error alleged.  United States v. Frady, 456 U.S. 152, 170
(1982).

This "cause and prejudice" standard requires Fontanez to
show not only that "some objective factor external to the
defense" impeded his efforts to raise the issue as required by
each relevant procedural rule, Coleman v. Thompson, 501 U.S. 722,
753 (1991), but also that the error he alleges "worked to his
actual and substantial disadvantage, infecting his entire trial
with error," Frady, 456 U.S. at 170 (emphasis in original).  The
cause and prejudice standard is more difficult to establish than
the plain error standard.  Frady, 456 U.S. at 164-66.  Further,
Fontanez must make a separate showing of cause for each
procedural default, that is one showing of cause for the failure
to raise the claim in the district court, and another for the
failure to raise the claim on appeal.  However, the defendant is

12

not required to bring ineffective assistance of counsel claims on direct appeal.  See Massaro v. United States, 123 S. Ct. 1690, 1693 (2003).

Because Fontanez has not made the requisite showing, the Court should deny his § 2255 claims, with the exception of his ineffective assistance of counsel claims, without reaching the merits of his arguments.

IV.   Fontanez's Attorney was not Ineffective

The defendant alleges that his counsel was ineffective for various reasons set forth above.  These arguments must fail, however, because Fontanez has failed to prove by a preponderance of the evidence[2] that Attorney Bernard's performance was not reasonably professional or that his performance undermined confidence in the outcome of the case.

In Singleton v. United States, 26 F.3d 233, 238 (1st Cir. 1994), the First Circuit explained the basic principles underlying ineffective assistance of counsel claims

> The Sixth Amendment provides that criminal
> defendants are entitled to the effective assistance of
> trial counsel.  "But 'the Constitution does not
> guarantee a defendant a letter-perfect defense or a
> successful defense; rather the performance standard is
> that of reasonably effective assistance under the
> circumstances then obtaining.'  . . . The habeas court
> must evaluate the [challenged] conduct from counsel's
> perspective at the time, considering the totality of

_____

[2]The burden is on Fontenez to demonstrate his counsel's ineffectiveness by a preponderance of the evidence.  Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993).

13

the circumstances before it, and making every effort to
eliminate the distorting effects of hindsight." . . .
We indulge "a strong presumption that counsel's conduct
falls within a wide range of reasonable professional
assistance."  Besides bearing the burden of proving
that trial counsel's performance was not within this
wide range of reasonable professional assistance, [the
movant] must establish that counsel's performance was
sufficiently prejudicial to undermine confidence in the
outcome of the trial.

Id. (Citations omitted).

Seen through the filter of the First Circuit's jurisprudence

on ineffective assistance of counsel habeas motions, Fontanez's

complaints about his counsel do not have merit.

1.   The defendant alleges that his attorney was ineffective

because he failed to call several witnesses, including co-

defendant Bledsoe, who would have testified that Fontanez was not

involved in the drug deals.  Preliminarily, Fontanez terminated

Attorney Bernard after several hearings on December 15, 1999 and

acted pro se with Attorney Bernard acting as stand-by counsel

when the trial began on January 10, 2000.  In fact, Fontanez

delivered his own opening statement prior to requesting that

Attorney Bernard resume his representation of Fontanez.  Although

openings are not evidence, it is worth noting that Fontanez told

the jury that he was a drug dealer, but was the type of drug

dealer who sold drugs just to survive, not one that sold drugs to

wear fancy cloths or drive a nice car.

2.   Calling co-defendant Bledsoe as a witness would have

harmed Fontanez's case.  Co-defendant Bledsoe, who plead guilty

14