EXHIBIT A

MANUFACTURED TESTIMONY OF THE AGENTS AT TRIAL

1. On December, 14, 1998, Agent Soto prepared a report about an alleged observation he conducted, on September 8, 1998, while on surveillance of 5 Federal Court, a building where co-defendant Anthony Bledsoe resided. Summarily, Mr. Soto stated that, roughly an hour prior to a deal arranged between Mr. Bledsoe and U/C Greg Finning. He observed Mr. Fontanez and Mr. Quinones leave out the building in 5 Federal Court [Tr.Trans. Vol. I, P. 59-65]. In regards to the report being prepared three months after the observed activity, Mr. Soto, when asked "why the lapse in time" by the prosecution, stated that "... at that time it wasn't necessary...", and that there's no policy making it a requirement. Id. at 65.

   (a). Contrary to Agent Soto's statements, all suveillance reports must be prepared within 5 working days of the observed activity. See: DEA Special Agent Manual, § 6211. 1. There was no report made by Mr. Soto solely because these events never happened. It was beneficial to prepare one 3 months later, in order to introduce it at trial and give the jury the inferences that, 1) there was an existing conspiracy between Mr. Fontanez and Mr. Quinones, and 2) that they drop-off the drugs to Mr. Bledsoe an hour prior to the arranged transaction. Thus, establishing a knowing participation by Mr. Fontanez and Mr. Quinones, through the implementation of a fabricated report by Agent Soto.

2. Agent Christopher Grenier, testified to what he allegedly abserved on October 6, 1998 moments prior to the transaction between Mr. Bledsoe and U/C Greg Finning, stated that the Red Buick driven by petitioner, "parked to the left ... a fair distance to the entrance ... down toward the back of Burger King..., when, ... the parking lot was relatively empty... and there weren't any cars in between the Buick...."

   (a). None of this detail was ever written in Agent Grenier's report or in any other agent's report for that matter. The Burger King in question, has no drive-thru, there was no other choice but to park in the parking lot which is layed directly in front of Burger King's entrance, and this happened around 3:45 p.m. and was very doubtful that the parking lot was relatively empty when considering that Burger King is stationed in a shopping plaza.

   (b). This testimony was fabricated by Agent Grenier in order to give the jury the the inference(s) that, 1) petitioner was in conspiracy with Mr. Bledsoe in transferring the drugs from the "black school bag" into the "Burger King bag", clear from any pedestrian's observation or interference, by parking away a far distance from the entrance of Burger King.

3. Officer Moses Zanazanian, for purposes to identify the driver of the Red Buick by conducting a Motor Vehicle Stop, described the events which allegedly took place on September 8, 1998. He stated that by happenstance Mr. Fontanez committed a Motor Vehicle Violation, "... Speeding, ...clocked and estimated

1

... going 45 miles an hour..." at a posted speed of "... 35 miles an hour...." [Tr.Trans. Vol. III, P. 343-344]. Onced pulled over, Mr. Zanazanian allegedly observed Mr. Fontanez "...reaching underneath the seats of the vehicle ...", where he was ordered "... to put his hands up on the steering wheel ...", which was allegedly dishored by Mr. Fontanez, and after continued search underneath the seats by him, he "... pick up his cell phone...." Id. at 346.

(a). Mr. Fontanez, then, "...dial the cell phone..." while allegedly disobeying Mr. Zanazanian's order "... to hang up..." and to have him produce license and registration, which he "...refused". After refusing "...several more times...", Mr. Fontanez decided to tell Mr. Zanazanian that "... his attorney was on the phoneand for me (Mr. Zanazanian) to talk to him...." Eventually, Mr. Fontanez provided his license and registration, but was "...very verbally abusive..." towards Mr. Zanazanian. Ending the events when Mr. Fontanez was out of the car. Id. at 346-348.

(b). There were no reports and/or citations introduced evidencing these events as manufacturely provided by Mr. Zanazanian, and upon which Mr. Fontanez could have cross-examine him against. These events were soley manufactured to give the jury the inference(s) that, 1) Mr. Fontanez was an outlaw who naturally violates the law, i.e., committing Motor Vehicle violations, and 2) that Mr. Fontanez has no respect for the law and its officials.

4. Agent Elden Wallen, for purposes of describing what Mr. Fontanez was observed doing on October 6, 1998, about an hour prior to the transaction between Mr. Bledsoe and U/C Greg Finning, stated that Mr. Fontanez, "came out of 33 Murray Hill Avenue and ran to the Buick ...", with "... a black backpack...." When asked of his opinion of this event by the prosecution, he stated that "... He (Mr. Fontanez) left that address as if he was in a hurry...", where Mr. Fontanez entered the Red Buick and "... sped off quickly...." [Tr.Trans. Vol. III, P. 406-408].

(a). All agents are fully aware that "Investigative reports should describe whatever is to be reported -- fully, exactly, and plainly- without opinion or exposition," and "... they will be completed within 5 working days after concluding the investigative activity...." See: Agents Manual, § 6211.1 & 6211.2. Mr.Wallen testifying in this particular instance was used to give the jury the inference(s) that, 1) Mr. Fontanez's alleged behavior was very suspicious, 2) it indicates Mr. Fontanez's state of mind, one aware of the deal and of getting to the designated location on time, and 3) it demonstrated a knowing participation of Mr. Fontanez.

2

# EXHIBIT B

## AFFIDAVIT

I, ALEX P. BAGINSKI, being duly sworn, depose and state:

1. I am a police officer for the City of Westfield, Massachusetts, and have been so employed since October, 1986. I was assigned to Uniform Patrol Division in January of 1987 and assisted the Narcotics Unit in numerous investigations, which have involved the illegal possession, manufacturing, and/or distribution of controlled substances. My assignment as of October 1989, has been to the Detective Bureau Narcotics Division, investigating violations of Chapter 94C, controlled substances of the Massachusetts General Laws. My present assignment as of June 1, 1998, is to the office of the Drug Enforcement Administration as a member of Western Massachusetts Narcotics Task Force.

2. I have interviewed and assisted in interviewing many cooperating individuals, whose information has led to search warrants being obtained and arrests/convictions being made for violations of narcotics laws. I have completed numerous hand to hand narcotics transactions that resulted in arrests/convictions for violations of narcotics laws. I am familiar with the appearance and characteristics of controlled substances, including cocaine and crack cocaine, and the ways in which they are used, manufactured, packaged and sold.

3. My education includes the following: an Associates degree in Law Enforcement from Holyoke Community College, received in 1979; a Bachelor of Science and a Masters of Arts

1

degree in Criminal Justice from Anna Maria College in 1998. I have attended numerous classes and seminars relating to narcotics, including yearly updated courses concerning narcotic enforcement, substance abuse and identification at the Agawam Police Academy; a seminar concerning search and seizure conducted by the Massachusetts Committee on Criminal Justice; a one week course and seminar conducted by the Narcotic Enforcement Officers Association in the fall of 1990; a two day Demand Reduction Initiative seminar sponsored by the Drug Enforcement Administration in June of 1991; an Edmands and Heir Search and Seizure Seminar on August 14-15, 1993; a two day Asset Forfeiture seminar on January 12-13, 1994, and a Concealed Compartment course on March 7, 1995, conducted by the Drug Enforcement Administration; annual three day conferences, sponsored by the N.E.N.E.O.A., in May 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998; five day seminars sponsored by the N.E.O.A., in 1995 and 1996 and a two week course of study conducted by the Drug Enforcement Administration in March of 1997.

   4.   On July 1, 1998, after a confidential informant (hereinafter referred to as "CI") had arranged to purchase a ½ ounce of crack cocaine for $400 from Robert Phillips, the CI and an undercover DEA agent (hereinafter referred to as "U/C") met with Phillips at One-Stop Liquor Store on State Street, Springfield, MA. Phillips entered the CI and U/C's car and told them that he had to go to Federal Court to get the ½ ounce of crack cocaine. The CI and U/C drove Phillips to Federal Court.

2

Phillips exited the car and met an individual later identified as Anthony Bledsoe in front of 5 Federal Court. Phillips and Bledsoe both went inside 5 Federal Court. A few minutes later, Phillips exited alone and returned to the car with the ½ ounce of crack cocaine, which he sold to the CI and U/C for $400. Phillips told the U/C to call him directly if the U/C wanted to buy any crack cocaine in the future. The ½ ounce of crack cocaine tested positive for crack cocaine.

5. On July 8, 1998, the U/C met Phillips at the One-Stop Liquor Store to purchase an ounce of crack cocaine for $850. Phillips entered the U/C's car and gave the U/C a package of crack cocaine. The U/C weighed the crack cocaine and determined that it was not a full ounce. Phillips exited the U/C's vehicle, walked across the parking lot, and approached a vehicle in which Bledsoe was sitting. After talking to Bledsoe, Phillps returned to the U/C's car. Phillips and the U/C agreed that the U/C would pay $800 for the crack cocaine. The U/C paid Phillips $800 and received the crack cocaine in return. After the deal, Bledsoe approached the U/C and told the U/C to call him later to obtain the remaining crack cocaine needed for a full ounce. The crack cocaine obtained on July 8th tested positive for crack cocaine.

6. Later during the afternoon of July 8, 1998, the U/C called Bledsoe to purchase the remaining portion of the ounce of crack cocaine. During their conversation, Bledsoe told the U/C to deal with him directly to avoid any problems in the future.

7. On July 16, 1998, the U/C called Bledsoe and arranged

3

for the purchase of two ounces of crack cocaine for $1,500. After the U/C parked his car in the parking lot of a Kentucky Fried Chicken, Bledsoe approached the car and entered it. Bledsoe told the U/C that he only had an ounce because he had just sold a ½ kilo of crack cocaine. The U/C agreed to buy an ounce of crack cocaine for $800, which Bledsoe subsequently gave to the U/C. The U/C and Bledsoe agreed to do additional deals in the future.

8. During the month of July, 1998, Bledsoe often paged the U/C and entered a telephone number that the U/C was supposed to call. This telephone number came back to 5 Federal Court, Apartment 3A.

9. On August 5, 1998, the U/C met Bledsoe at the One-Stop Liquor Store. Bledsoe arrived in a maroon Pontiac Grand Am, license plate number 288-XEI, being driven by a black female. The registration for 288-XEI was in the name of Shannon Gresham, 837 Beacon Circle, Springfield, MA. Bledsoe entered the U/C's car, and the U/C and Bledsoe went for a drive. The maroon Grand-Am followed the U/C and Bledsoe. While driving, Bledsoe agreed to sell the U/C an eighth of a kilogram of crack cocaine (hereinafter referred to as a "Big-8") for $3,200. During their drive, Bledsoe directed the U/C towards 245 Senator Street, Springfield, MA. Bledsoe told the U/C that Robert Phillips lived at 245 Senator Street, and that he, Bledsoe, now lived in the apartment complex called "Colonial Estates" located on Beacon Circle in Springfield, MA. When the U/C and Bledsoe arrived at

245 Senator Street, Bledsoe asked the U/C if he wanted to try a sample of crack cocaine that Bledsoe recently had received from his Cuban friend who had been released from jail recently. The U/C agreed. Bledsoe exited the car, went inside 245 Senator Street, and returned to the U/C's car a few minutes later. Bledsoe gave the U/C a free sample of approximately 1 gram of crack cocaine. This substance later tested positive for crack cocaine.

10. On August 7, 1998, Bledsoe agreed to sell the U/C a Big-8. The U/C met Bledsoe at the front entrance of Colonial Estates on Beacon Circle, Springfield, MA. When the U/C arrived, Bledsoe exited his car and entered the U/C's car with a brown paper bag, inside of which was a Reebox sneaker box. The box contained approximately 125 grams of crack cocaine. The U/C paid Bledsoe $3,100. The U/C saw Bledsoe put the $3,100 into his right front pants pocket and leave his car. At approximately 2:08 p.m., Bledsoe got inside his car and drove the car a short distance towards his residence at 837 Beacon Circle, where Bledsoe parked his car nearby. At 2:12 p.m., Bledsoe exited his car and met a Hispanic male at the driver's side door of a Ford Explorer. Bledsoe reached into his right front pants pocket, the same pocket in which Bledsoe had placed the $3,100 received from the U/C, and handed something, which Bledsoe's hand concealed, to the Hispanic male. The Hispanic male walked around to the passenger side of the Explorer, placed the object inside, and talked to Bledsoe until 2:15 p.m. Bledsoe then went into 837

Beacon Circle, and the Hispanic male drove off in the Explorer. The Explorer, which had license plate number 1999 JH, was registered in the name of Sylvia Adorno, 83 Albert Avenue, Indian Orchard, MA. The Explorer was followed to the area of Murray Hill Avenue, Springfield, MA. The Hispanic male parked the Explorer in front of 24 Murray Hill Avenue, crossed the street, and entered the house across the street from 24 Murray Hill Avenue, which was 33 or 35 Murray Hill Avenue. Shortly thereafter, the Hispanic male left 33 or 35 Murray Hill Avenue and drove to the Springfield bus terminal, where he picked up a second Hispanic male. Through a traffic stop, the Hispanic driver orally identified himself as Carlos Quinones and reported his address as 33 Murray Hill Avenue, First Floor, Springfield, MA. Quinones did not have any identification on him.

11. On August 19, 1998, Bledsoe agreed to sell the U/C a Big-8 for $3,100. On August 20, 1998, surveillance set up on 33 Murray Hill Avenue. At approximately 1:30 p.m., three Hispanic males left 33 Murray Hill Avenue and entered a Red Buick sedan, license plate number 4691BC. At approximately 1:31 p.m., the U/C received a page from Bledsoe to call 413-781-6100, which was identified to a location called Tippy's Beeper World. The U/C called Bledsoe, who told the U/C that he was ready to do the deal, but was waiting for the Cuban to arrive with the product. Bledsoe told the U/C that he would page the U/C when the Cuban arrived with the crack cocaine. During this conversation, the U/C told Bledsoe that he wanted another two ounces along with the

6

Big-8. Bledsoe told the U/C that he would discuss it with the Cuban and page the U/C in several minutes.

12. At approximately 1:45 p.m., the U/C received a page from Bledsoe to call him at 413-781-6100, the number identified as Tippy's Beeper World. The U/C called Bledsoe, who told the U/C that he could sell the U/C the Big-8 and the additional ounces for $4,000, but that the crack cocaine would be in two separate bags, one containing 125 grams and the other containing 43 grams. Bledsoe again told the U/C that he would page the U/C when the Cuban arrived with the product.

13. At approximately 1:50 p.m., the red Buick containing the three Hispanic males arrived at Tippy's Beeper World and parked in the rear parking lot. At approximately 2:05 p.m., the three Hispanic males could be seen bent down under the front dash of the red Buick. At approximately 2:07 p.m., the three Hispanic males entered the building next to Tippy's Beeper World. At approximately 2:23 p.m., the red Buick left the rear parking lot of Tippy's Beeper World, but it could not be determined who the occupants were.

14. At 2:30 p.m., the U/C received a page from Bledsoe to call 413-781-6100. The U/C called Bledsoe, who told the U/C that he was ready to do the deal. Bledsoe and the U/C agreed to meet at the front entrance of Colonial Estates on Beacon Circle at approximately 3:00 p.m.

15. At 3:15 p.m, the U/C arrived at the front entrance of Colonial Estates. Bledsoe arrived in a red Buick that was being

7

driven by a dark-skinned male. The red Buick sedan had license plate number 4691BC, the same vehicle seen leaving 33 Murray Hill Avenue and later in the rear parking lot of Tippy's Beeper World. Bledsoe got out of the passenger side, walked to the U/C's car, and handed the U/C a brown paper bag. The bag contained two plastic baggies containing crack cocaine. The U/C paid Bledsoe $4,000, and Bledsoe departed in the red Buick. The substance later tested positive for crack cocaine, and weighed 187 grams. The registration to the red Buick sedan came back to a car rental agency in East Windsor, CT.

16. In late August, 1998, Bledsoe told the U/C that he had a business called Chocolate City Fashions, a women's clothing store. Bledsoe told the U/C that his business was located in a room next to Tippy's Beeper World. Bledsoe told the U/C that he had sub-leased the room, but that he had closed the business.

17. On August 25, 1998, Bledsoe called the U/C and told him that he was going to Atlanta. Bledsoe wanted to know if the U/C needed anything before he left. The U/C asked Bledsoe if the Cuban was going with Bledose, and Bledsoe answered yes. Bledsoe also told the U/C that the Cuban had been driving the car when they did the deal on August 20th.

18. On September 3, 1998, Bledsoe paged the U/C, who returned the telephone call. Bledsoe told the U/C that he had two Big-8s available for sale. The U/C told Bledsoe that he would be interested in buying the Big-8s next week.

19. On September 8, 1998, at approximately 1:15 p.m., the

8

U/C received a page from Bledsoe. The U/C called Bledsoe and asked Bledsoe if he still had the two Big-8s for sale. Bledsoe responded that he did. The U/C told Bledsoe that he only had money for one Big-8, but wanted both, and would pay Bledsoe for the second Big-8 later in the week. Bledsoe told the U/C that he would check with the Cuban and call the U/C back in several minutes. At 1:45 p.m., Bledsoe paged the U/C, who returned the call. Bledsoe told the U/C that the Cuban did not want to give the U/C both Big-8s with only payment for one. Bledsoe told the U/C that the Cuban would sell the second Big-8 later in the week for $2,750.00. Bledsoe and the U/C agreed to a purchase of one Big-8 for $2,900 at Colonial Estates on Beacon Circle at 3:00 p.m.

20. Surveillance was set up on 33 Murray Hill Avenue. At approximately 2:20 p.m., an unidentified dark-colored male driving a red Buick sedan, license plate number 4691BC, the same car seen during the August 20th deal, arrived at 33 Murray Hill Avenue. A short time later, the red Buick operated by the same dark-colored male left the residence at 33 Murray Hill Avenue and drove to 5 Federal Court. Bledsoe walked out of 5 Federal Court carrying a brown paper bag and entered the passenger side of the red Buick.

21. At 2:55 p.m, the U/C arrived at the front entrance of Colonial Estates. The red Buick sedan drove directly from 5 Federal Court to the front entrance of Colonial Estates, where it arrived at approximately 3:05 p.m. Bledsoe was the passenger,

9

and the dark-colored male was still the driver. Bledsoe got out of the passenger side, walked to the U/C's car, and handed the U/C a brown paper bag through the passenger window. The bag contained a Big-8 of crack cocaine. The U/C paid Bledsoe $2,900, and then asked Bledsoe if he could meet the Cuban. Bledsoe told the U/C that the Cuban was not ready to meet the U/C. Bledsoe walked back over to the red Buick and got inside. The red Buick then drove off. The substance received from Bledsoe field tested positive for crack cocaine.

22. The red Buick containing the dark-colored male and Bledsoe drove from Colonial Estates to Tippy's Beeper World. The male driver and Bledsoe both got out of the red Buick. A short time later, the red Buick being driven by the same dark-colored male left Tippy's Beeper World and drove directly to 33 Murray Hill Avenue. The dark-colored male, now identified as being a Hispanic male, then walked up the driveway at 33 Murray Hill Avenue. At approximately 4:25 p.m., the same Hispanic male left Murray Hill Avenue in the red Buick. A short time later, the red Buick was stopped. The Hispanic male identified himself as Rafael Fontanez and reported a residence of 17 Hebron Street, Springfield, MA. Surveilling agents who participated in the surveillance of the drug transactions on August 20th and September 8th identified Fontonez as the individual who drove the red Buick and delivered Bledsoe and the crack cocaine to the U/C on those two occasions.

23. Subsequent investigation has revealed that Fontonez was

arrested in Meridan, CT on ~~August 2, 1998~~ October 15, 1997 APB. The case was dismissed on March 2, 1998. At the time of Fontonez' arrest, Quinonez was with Fontonez and was also arrested. This is consistent with Bledsoe's statement on August 5th when he told the U/C that the free sample of crack cocaine came from his Cuban friend who had been released from jail recently.

24. During the month of August, 1998 and early September, 1998, when the U/C returned Bledsoe's pages, the U/C returned Bledsoe's pages to a telephone number that came back to 837 Beacon Circle. This was consistent with the location of the deals during that time frame. However, in the last several weeks, the U/C has returned Bledsoe's pages to the telephone number for 5 Federal Court, Apartment 3A. In addition, Bledsoe has told the U/C that he is living with a female at 5 Federal Court.

25. The U/C has remained in contact with Bledsoe during the last several weeks. On September 30th, Bledsoe paged the U/C, who returned the page to the telephone number at 5 Federal Court, Apartment 3A. Bledsoe asked the U/C if he needed anything. The U/C told Bledsoe that he needed 1/4 kilogram of crack cocaine, but also asked Bledsoe if Bledsoe could sell ½ kilogram of crack cocaine for $10,000. Bledsoe told the U/C that he was not on a good telephone and would call the U/C back.

26. On October 1st, Bledsoe paged the U/C, who returned the page. The U/C asked Bledsoe if he could get what they talked about the day before, and Bledsoe told the U/C that he could do ½

11

kilogram of crack cocaine for $10,000. The U/C then told Bledsoe that he had an investor who was interested in going in on a full kilogram of crack cocaine for $20,000. Bledsoe told the U/C that a full kilogram would not be a problem.

27. On Friday, October 2nd, Bledsoe and the U/C exchanged numerous pages. The U/C eventually talked to Bledsoe and told Bledsoe that his investor was having a tough time coming up with the money. The U/C told Bledsoe that he had given his investor until Monday to come up with the money, and that if his investor was unable to come up with the money, then the U/C would do the ½ kilogram on Tuesday. If his investor produced the money for a full kilogram of crack cocaine, then the U/C wanted to buy the full kilogram on Tuesday. Bledsoe agreed to that arrangement.

28. On several mornings during the last week, drive-bys have been conducted past 17 Hebron Street, the residence of Fontonez. The surveilling agent has reported that he has seen the red Buick sedan, license plate number 4691BC, parked outside 17 Hebron Street on each occasion.

29. Based upon my experience investigating drug crimes, I believe that 33 Murray Hill Avenue is either the cook house or stash house for crack cocaine. I base this upon the fact that 33 Murray Hill Avenue appears to have played a significant role immediately prior to and after the deals on August 20th and September 8th. In addition, 33 Murray Hill Avenue was the reported address of Quinonez who was not only present at the August 7th deal, but also drove to the vicinity of 33 Murray Hill

Avenue and appeared to go inside 33 Murray Hill Avenue immediately after the August 7th deal. In addition, Bledsoe has not been reluctant to let the U/C see or know about 5 Federal Court or 837 Beacon Circle, but has never mentioned or referred to 33 Murray Hill Avenue in any way during their many conversations over the past several months. This is also consistent with Bledsoe not wanting the U/C to meet the Cuban for fear of being cut out of future deals.

30. Based upon my experience investigating drug crimes, I know that drug traffickers commonly possess narcotics and evidence other than narcotics inside a residence. Cook or stash houses commonly contain controlled substances, substances used to cut cocaine, ingredients used in the manufacturing process for crack cocaine, scales, packaging materials such as baggies, firearms to protect their stash, and other implements of the drug trade. Stash houses also commonly contain other forms of evidence such as receipts, invoices, address books, pager numbers written on scraps of paper, drug ledgers, pay and owe figures written on scraps of paper, and other forms of evidence that tend to prove violations of narcotics laws and assist in linking co-conspirators and criminal associates together. This evidence often is found in various locations throughout a residence, including kitchens, bedrooms, living rooms, and within dresser drawers, personal effects such as handbags, wallets, and clothing, and other smaller areas.

31. Based upon my experience investigating drug crimes, I

13

know that homes of sources and distributors commonly contain other than narcotics inside a residence. Homes of sources or distributors typically contain quantities of controlled substances, scales, and packaging materials, such as baggies. Such residences also typically contain forms of evidence such as address books, pager numbers written on scraps of paper, drug ledgers, pay and owe figures written on scraps of paper, and other forms of evidence that tend to prove violations of narcotics laws and assist in linking co-conspirators and criminal associates together. This evidence often is found in various locations throughout a residence, including kitchens, bedrooms, living rooms, and within dresser drawers, personal effects such as handbags, wallets, and clothing, and other smaller areas. In addition, based upon my experience investigating drug crimes, I know that distributors and sources also commonly possess documents, writings, cash, bankbooks, bank statements, and safety deposit keys that tend to prove revenues gained through the illegal manufacture or distribution of said substances. Finally, homes of distributors and sources also commonly contain firearms to protect the money earned from being in the drug business.

ALEX P. BAGINSKI
Task Force Agent
Drug Enforcement Administration

In Re:  United States v. Rafael Fontanez
        Case No: 04-C0-30007-MAP

## AFFIDAVIT

I, Nancy Cabrera, do affirm, under the penalty of perjury, that the following facts are true to the best of my knowledge and I'm willing to testify to the same in court.

On January 19, 2000, while waiting outside the courtroom for the jury's verdict, Mr. Bernard stated that he wanted to explain the jury's deliberation process and what can happen once they reach their verdict.

Mr. Bernard took me inside a conference room, a room outside the courtroom, and after he explained the above he talked about his personal relationship with officer Richard Soto. Mr. Bernard stated that, "He has known Mr. Soto since being a prosecuting attorney where they worked in cases together, and that he hated the fact that Mr. Soto would go as low as fabricating evidence to get a conviction." He also stated, "Both of their children attended the same school, and that he saw and spoke to Mr. Soto often, but that, now, resented the friendship they shared throughout the years." Mr. Bernard went on to say that, "If the worst should happen with the jury's verdict. He would do anything within his power to help my son win his appeal" End of conversation.

I swear the above conversation between Mr. Bernard and me, is true and nothing but the truth.

*[signature]*
Nancy Cabrera

## JURAT

On this 11TH day of March of 2004, Mrs. Nancy Cabrera came and swore before me that the facts herein are true and correct to the best of her knowledge.

PETER S. CHO
Notary Public, Massachusetts
My Commission Expires August 23, 2007

Seal

Commission: _____

Notary: *[signature]*